UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**ANTIDOTE HEALTH PLAN OF ARIZONA, INC.**, et al.,

        Plaintiffs,

        v.

**XAVIER BECERRA**, Secretary, U.S. Department of Health & Human Services,

        Defendant.

Case No. 1:23-cv-03578 (TNM)

## MEMORANDUM OPINION

Antidote Health Plan of Arizona and Antidote Health Plan of Ohio (collectively, "Antidote") sought certification from the Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS") to participate in the states' health insurance exchanges. CMS denied the certification request on the grounds that Antidote failed to meet certain network adequacy standards. It also determined that certifying Antidote would not be in the best interest of beneficiaries. Antidote administratively appealed. On reconsideration, CMS rejected certification again. Although CMS acknowledged Antidote had since demonstrated compliance with network adequacy requirements, it continued to believe that certification was not in the best interest of beneficiaries.

Antidote seeks review of that decision here. It charges CMS[1] with acting arbitrarily and capriciously. And it contends that the internal agency review process lacked sufficient due process protections. Antidote moves for summary judgment on these grounds, and CMS

---

[1] Technically, Antidote sued Xavier Becerra, the Secretary of Health and Human Services. But the Court refers to the Defendant as "CMS" for the sake of logical simplicity.

responds with its own cross-motion for summary judgment. These motions are now ripe for disposition.

The Court finds that CMS is entitled to summary judgment on the claim that it acted arbitrarily and capriciously. CMS provided a reasoned and comprehensive explanation for why it denied Antidote's application that was supported by the factual record. It followed its own procedures for internal appeals and offered Antidote a fair shot at reconsideration. Ultimately, though, it rationally concluded that certification would not be in the best interest of health care beneficiaries. As for the due process claim, Antidote failed to demonstrate that it was deprived of a protected property interest. So CMS is entitled to summary judgment for that claim, too. Antidote's motions will be denied.

## I.

The Court starts with a sketch of the statutory and regulatory background. Then it discusses how Antidote and CMS fit in.

### A.

Start broad. With the Patient Protection and Affordable Care Act ("ACA"), Congress set out to enhance accessibility to quality insurance plans. *Nat'l Fed'n Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). Thus, alongside many other provisions, the ACA established "Affordable Insurance Exchanges," which are virtual marketplaces "for individuals and small employers to directly compare available private health insurance options on the basis of price, quality, and other factors." 76 Fed. Reg. 41,866 (July 15, 2011) (proposed rule); 42 U.S.C. § 18031. While the ACA encourages states to create their own exchanges, the federal government steps in if a state cannot or will not. 42 U.S.C. §§ 18031(a), 18041(c). When the marketplace is created by

the federal government, it is called a Federally-Facilitated Exchange ("FFE"). *King v. Burwell*, 759 F.3d 358, 364 (4th Cir. 2014), *aff'd*, 576 U.S. 473 (2015).

The ACA is picky about which health insurance providers get to participate on the exchanges. Only "Qualified Health Plans" are entitled to offer their services to potential beneficiaries. 42 U.S.C. § 18021. For an issuer to become a Qualified Health Plan, it must go through CMS. That means making two broad showings to the agency. First, that the plan "meets the requirements for certification." 42 U.S.C. § 18031(e)(1)(A). Second, that "making available such health plan through such Exchange is in the interests of qualified individuals and qualified employers in the State or States in which such Exchange operates." 42 U.S.C. § 18031(e)(1)(B).

Break that down a bit further. Three requirements for certification are particularly relevant here. First, a plan must submit accurate rate and benefit information to CMS. 45 C.F.R. § 156.210. Second, it must provide an accurate directory of in-network medical providers so beneficiaries can get in touch with their doctors. 45 C.F.R. § 156.230(b)(1). And third, the plan needs to meet "network adequacy" standards, meaning it must have enough in-network providers across various specializations that have agreed to accept the plan's rates as payment in full for covered items and services. 42 U.S.C. § 18031(c)(1)(B); 45 C.F.R. § 156.230(a)(1). Plus, these providers need to be within a reasonable time and distance of most consumers. 45 C.F.R. § 156.230(a)(2)(i)(A).

In practice, certification happens through an iterative and cooperative process. Prior to the application window, CMS publishes guidance about the highly technical steps an issuer must take to be considered for certification. *See generally* Admin. Record Vol. II ("AR II"), ECF No. 21. Then CMS issues a bulletin specifying deadlines for the upcoming plan year. AR II at 1–3.

For the 2024 plan year, there were four key deadlines in the summer of 2023: (1) the optional "early bird" deadline on May 17; (2) the initial application submission deadline on June 14; (3) the second deadline on July 19; and (4) the final deadline on August 16. *Id.* at 2.

The successive deadlines have a sifting function. Because the process of data submission can be complicated, especially for first-timers, applicants collaborate with CMS to refine their datasets, deadline-by-deadline. *Id.* at 44. The "early bird" deadline is for those who need even more help, allowing novice applicants to get a jump on the process. That way, by the time the final deadline rolls around, the applications are near-perfect. *Id.*

The demand for accurate data is not some arbitrary condition imposed by a persnickety bureaucrat. On the contrary, mistakes have significant impacts on consumers. For instance, suppose a provider missed a 0 when reporting its premium rates. A beneficiary might find herself paying ten times more for her medication than she expected. She might have to forego the medication. And she would be locked into her plan until the next open enrollment cycle. *See* Admin. Record Vol. I ("AR"), ECF No. 21, at 10. So the need for precision is paramount.

To achieve perfection, CMS plays a significant support role. CMS offers a wide range of resources to help applicants get their databases in fighting shape. For instance, it hosts live webinars where participants can view demonstrations and ask questions in real time, offers technical assistance videos for streaming on demand, and provides access to an online help desk. AR II at 308–09. It permits applicants to preprocess their data against the same database systems that CMS uses so applicants can work out any kinks before the deadlines. *Id.* at 45–47. And it holds individual calls with applicants whose datasets set off warning bells to offer specific feedback and assistance. *Id.* at 234.

**B.**

In the summer of 2023, Antidote decided to throw its hat in the ring. It told CMS is intended to seek certification to participate in the Ohio and Arizona FFEs shortly before the initial deadline. AR at 28–30. The parties had to get to work quickly. Antidote had never appeared on any exchange, nor had it ever issued any health plan in any state. *Id.* at 1. In fact, it had only ever provided telehealth medicine. *Id.* at 32, 35. So Antidote had a lot of work to do before it was to submit its first dataset within days, especially since it had not capitalized on the early-bird deadline. *Id.* at 28. But CMS was eager to help. *Id.* It met with Antidote representatives to inform them about the various resources available to streamline the application process. *Id.*

Yet the collaborative relationship would soon deteriorate. To start, CMS discovered some serious errors in the initial dataset. *Id.* at 34, 133. Antidote's application gravely missed the mark on the network adequacy requirement. *See id.* at 61–62. CMS reached out to Antidote to try to remedy the data deficiencies, setting up video calls and offering additional resources. *Id.* at 60–61. But this proved fruitless. When the second deadline came around, Antidote again failed to meet network adequacy standards. *Id.* at 133. Indeed, Antidote's network adequacy compliance rate was the lowest among all FFE applicants that year. *Id.*

So when the final deadline arrived and suddenly Antidote's network adequacy compliance rate was the *highest* in the country, eyebrows raised. *Id.* CMS decided to do a deep-dive with an independent contractor on the datasets to understand the about-face. *Id.* at 133, 135. These reviews revealed extensive errors and "egregious misrepresentations" in all Antidote's datasets. *Id.* For one, a more thorough investigation of the earlier data revealed that "[e]ven when Antidote was [the] poorest performing applicant during earlier submission rounds,"

skewed numbers had "artificially inflated" those scores. *Id.* So the errors were even worse than CMS had originally suspected. This trend of misrepresentation worsened by the final round, when Antidote's templates "invalidly boosted their [network adequacy] scores . . . artificially transforming them from [the] poorest performing applicant to [the] best performing applicant for the final submission round." *Id.* In short, Antidote's data was "gibberish," and CMS was poised to deny its application. *Id.* at 134.

But a conference call with Antidote persuaded CMS to show mercy. CMS had made the call to inform the company of the denial of its application. *Id.* at 122. But then Antidote's CEO "literally begged [CMS] for a path forward, stating a denial of certification would close the company and everyone would lose their jobs." *Id.* So CMS "made the decision on the spot that while [it] would keep the denial mechanism moving on [its] end," it would open a "limited data correction window" as a last-ditch effort. *Id.* CMS was "crystal clear" that the correction window was "an unprecedented last lifeline." *Id.* And it told Antidote that CMS would "still proceed with clearing the denial letter," but that it might grant a reconsideration request based on the updated data. *Id.* The data, though, would need to be "near perfect, needing little further review on [CMS's] side." *Id.* Antidote complied, submitting another dataset days later. Pl.'s Mot. Summ. J., ECF No. 15-1, at 8.

A couple of weeks later, CMS sent Antidote a formal written denial of its application ("Initial Denial"). AR at 14. It rejected the application, finding that Antidote failed both broad conditions of certification. *First*, CMS "determined that Antidote Health did not provide sufficient evidence during the certification process" to show it "complie[d] with the minimum certification requirements related to network adequacy." *Id.* CMS noted that it could not "reasonably document" all the errors due to their "frequency and extent," but it offered a "non-

exhaustive, representative summary." *Id.* at 15.  CMS was particularly concerned that many of the most glaring errors appeared for the first time in the dataset submitted at the close of the formal application window.  *Id.*  Thus, Antidote failed to provide the objective evidence necessary to show it "[met] the requirements for certification" as mandated by 42 U.S.C. § 18031(e)(1)(A).

*Second*, CMS "determined that making the Antidote Health plans available through the FFEs in Arizona and Ohio would not be in the interest of qualified individuals." *Id.* at 16.  It gave several reasons for this conclusion and emphasized that any one of them alone would justify denying certification.  *Id.* at 16–18.  For instance, CMS expressed doubts that Antidote would materially comply with the network adequacy requirements due to "[t]he frequency and extent of the data submission errors" by Antidote.  *Id.* at 16.  These errors would "negatively impact the experience of consumers" since they "misrepresent[ed] [Antidote's] networks of providers."  *Id.*  So it was "foreseeable that many of these consumers would later discover that a substantial number of providers listed in the directory were never actually in Antidote Health's network or never practiced the specialty that Antidote Health represented when the consumer enrolled in its plan."  *Id.*

More, CMS questioned Antidote's ability to oversee the operations of its employees and independent contractors.  *Id.* at 17–18.  This, coupled with Antidote's "lack of technical knowledge," prevented CMS from concluding that "Antidote Health understands which oversight processes are necessary to prevent and remedy similar errors in future submissions." *Id.* at 17.  Altogether, "the[] errors demonstrate[d] a pattern of grossly inadequate oversight by Antidote Health that led it to submit erroneous provider and rate filing information to CMS and the State of Arizona over the span of multiple months." *Id.* at 18.  Because Antidote planned to

"rely on contractors to administer parts of its health plans," CMS was "concerned that this pattern [would] continue into the plan year and affect consumers directly." *Id.* Thus, Antidote also could not satisfy the second condition for certification under 42 U.S.C. § 18031(e)(1)(B).

CMS advised Antidote that it could seek reconsideration of the denial. *Id.* (citing 45 C.F.R. §155.1090(a)). While CMS informed Antidote that it "must include in any request for reconsideration any additional documentary evidence that [Antidote] wish[ed] [CMS] to consider," it requested that Antidote "not include any additional network adequacy templates." *Id.* at 19. This limitation reflected the data correction window that CMS had already opened for Antidote and the late dataset it had already received in the limited data correction window. *Id.*

In the following days, Antidote emailed a reconsideration request. *Id.* at 20. It noted that it had already "resubmitted corrected network adequacy data." *Id.* at 21. And it emphasized that it had "taken action to meaningfully improve [its] vendor oversight program and updated [its] Delegation Oversight Policy," which was purportedly attached to the request. *Id.* at 22. But no policy was provided. *Id.* at 6.

Then came the adjudication on the reconsideration request ("Reconsideration Decision"). CMS "sustain[ed] its determination that making the Antidote Health plans available is not in the interest of qualified individuals." *Id.* at 1. Thus it would not be "certifying the[] plans as QHPs for plan year 2024 in Arizona and Ohio." *Id.* CMS first acknowledged that Antidote's final data submission "appear[ed] to have corrected the significant errors CMS identified in its initial denial of QHP certification." *Id.* at 8. So Antidote had managed to meet the objective "requirements for certification" under 42 U.S.C. § 18031(e)(1)(A). But that was not enough. Antidote still failed to show certification would be in the interest of qualified individuals, under § 18031(e)(1)(B). *Id.* (emphasis added).

8

"Several factors" led to this conclusion. *Id.* First, throughout the filing ordeal, "Antidote Health failed to demonstrate an understanding of elementary principles for compliance with network adequacy requirements." *Id.* Indeed, "Antidote Health required extensive coaching by CMS on both the general standards for network adequacy and the data necessary for proving compliance with those standards"—despite these being "basic principles that any entity wishing to enter the QHP market must understand before seeking to participate on an Exchange." *Id.* And "even after extensive coaching by CMS, the data Antidote Health submitted in the application was wildly incorrect." *Id.* For example, in the dataset submitted at the close of the formal application window, Antidote's Arizona application listed a total of 10,070 acute inpatient hospitals with 24/7 emergency services in their network. *Id.* at 133. But there are only 144 inpatient hospitals in the state of Arizona, and there are only 6,129 hospitals in the entire United States. *Id.* Only after several tries did Antidote finally get it right.

On top of the data mismanagement, CMS found that "Antidote Health did not demonstrate that [it] could meet the requirements for adequate vendor oversight" as required by the regulations. *Id.* at 8. CMS stressed that "Antidote Health [had] admitted that it did not have procedures in place to ensure the accuracy of [its] vendors' provider data before Antidote Health submitted them to CMS." *Id.* Nor did CMS believe Antidote responded to some of the crucial concerns highlighted in the Initial Denial. Instead, it only offered generalized platitudes that it was beefing up its oversight procedures. *See, e.g.*, *id.* at 22 ("The Company understands that issues with vendors have the potential to result in issues for consumers, which is why Antidote is acting expediently to ensure they only work with well-vetted and highly reputable vendors, and that they maintain close oversight of those vendors through agreements, audits and close review of vendor deliverables."). But Antidote provided no specifics on its nebulous plans. *Id.* at 9. In

9

sum, "[g]iven Antidote Health's repeated inability to identify the adequacy of its network, the inadequacy of the oversight of its contractors, that certain bases for denial were not contested by Antidote Health, and its errors when attempting to communicate to CMS its operational readiness," the CMS affirmed its denial. *Id.* at 12.

Antidote promptly sought review of that decision here. Compl., ECF No. 1. The parties' cross-motions for summary judgment are now ripe for review. This Court has jurisdiction under 28 U.S.C. § 1331. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 378–89 (2012).

## II.

Antidote brings two challenges to CMS's decision. First, Antidote insists the adjudication was "arbitrary and capricious" and must be "set aside," as demanded by the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. Second, Antidote contends that CMS failed to provide sufficient procedural protections during the reconsideration process, in violation of the Due Process Clause of the Fifth Amendment. U.S. Const. amend. V.

When a party seeks review of agency action, "the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). So "[t]he 'entire case' on review is a question of law." *Id.* And when the Court is looking at an informal agency adjudication like this one, that review is quite narrow. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42–43 (1983). It must only satisfy itself that the agency reviewed the relevant evidence and "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43 (cleaned up).

It is not enough if the Court would have come out a different way. *Id.* Instead, agency action is only arbitrary and capricious if "the agency [] relied on factors which Congress [did]

not intend[] it to consider" or if it "entirely failed to consider an important aspect of the problem." *Id.* Or if the agency "offered an explanation for its decision that runs counter to the evidence" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* In short: The Court may not rewrite the playbook from scratch. But it will examine the challenged calls.

### III.

The Court starts with Antidote's claim that the reconsideration decision was arbitrary and capricious. It then considers the Due Process challenge.

### A.

Antidote has two main qualms with the denial of its certification. First, it contends that the Reconsideration Decision "is a study in arbitrary and capricious federal agency action." Pl.'s Mot. Summ. J. at 10. Second, it argues that CMS mishandled and abused the reconsideration *process*, depriving Antidote of a meaningful opportunity to appeal the Initial Denial. *Id.* at 10–17.

But these arguments carry little weight. First, consider the Reconsideration Decision. Antidote points out that the Reconsideration Decision accepts that Antidote ultimately satisfied network adequacy requirements. *See* AR at 7. And according to Antidote, its initial failure to "meet[] the requirements for certification" was the only reason its application was denied in the first place. 42 U.S.C. § 18031(e)(1)(A); Pl.'s Mot. Summ. J. at 10. Antidote claims that once the standards were met, it became unreasonable for CMS to double-down on its denial. Pl.'s Mot. Summ. J. at 10–11.

But of course, CMS had a sound independent basis for denying reconsideration— Antidote did not satisfy the second broad condition for certification. That is, even with the

11

corrected data, CMS thought certification would not be in the best interest of beneficiaries in Ohio and Arizona. AR at 8. And CMS justified that conclusion. *Id.* at 8–12. CMS feared that Antidote's pattern of missteps, dissimulations, and lapses in oversight would spell trouble for health care recipients. *Id.* It recounted these mistakes with specificity and directly linked them to the potential harm they would wreak upon consumers if allowed to continue. *Id.* CMS also had significant concerns about Antidote's ability to supervise its employees and contractors moving forward. *Id.* Antidote had provided no concrete solutions to mitigate those concerns. *Id.* at 9. Instead, it had provided only "broad representation[s] that Antidote Health would do better in the future." *Id.* It is hard to see how Antidote could claim that its initial inability to meet network adequacy standards was the only valid reason for denial.

Antidote attempts to minimize this slew of independent justifications. It asserts that all these other reasons derive from the initially flawed data. So according to Antidote, once the data was remedied, these concerns were necessarily remedied, too. Pl.'s Mot. Summ. J. at 11. Any other view, per Antidote, is irrational.

But Antidote cannot erase its past mistakes by polishing a spreadsheet. A delinquent debtor may pay up, but no one would say he is a good investment for the future. A vending machine that finally works on the hundredth try still needs to be replaced (and hungry customers refunded). To put it more concretely: Antidote's (eventual) compliance with the regulations cannot restore CMS's trust in the company. Nor can it erase Antidote's glaring pattern of missteps. And perhaps most importantly, it cannot remedy the blatant vendor and employee oversight issues for which Antidote offers no tangible solutions. In short, Antidote cannot force a showing on the second necessary condition for certification merely by finally satisfying the first.

CMS logically and persuasively laid out why Antidote's past failures were "strong indicators" that consumers would be harmed by Antidote's participation in the FFEs. AR at 12. And it detailed how Antidote made *further errors* when applying for reconsideration by failing to attach its purported updated oversight policy to its request and admitting it had miscalculated premium rates. *Id.* at 6. More, CMS feared that Antidote was "unprepared to ensure compliance by its delegated or downstream entities with applicable federal standards." *Id.* at 8. In sum, CMS found that "Antidote Health's operational readiness and managerial expertise are inadequate." *Id.* at 12. So CMS denied the certification on best interests grounds. *Id.*

Recall that an applicant must demonstrate *both* that it "meets the requirements for certification" *and* that "making available such health plan through such Exchange is in the interests of qualified individuals and qualified employers in the State or States in which such Exchange operates." 42 U.S.C. § 18031(e)(1)(A); 42 U.S.C. § 18031(e)(1)(B). CMS determined that Antidote could not satisfy the latter and justified its decision accordingly. Such action is both "reasonable and reasonably explained," which is all the APA requires the Court to conclude. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Next, Antidote takes umbrage with CMS's methods. It insists that the whole appeals process was tainted by an erroneous Initial Denial, stripping Antidote of a fair shot at reconsideration. Pl.'s Mot. Summ. J. at 13–18. And it claims that because reconsideration is mandated by federal regulation, by sullying that process CMS acted arbitrarily, capriciously, and "otherwise not in accordance with law." 5 U.S.C. § 706.

But Antidote's convoluted chain of blame breaks at each link. First, the Initial Denial. Antidote insists that the Initial Denial "disqualifies every part of the subsequent reconsideration process" because it "omitted the fact that Antidote had already submitted sufficient information"

13

to satisfy network adequacy standards.  Pl.'s Mot. Summ. J. at 13–14.  In other words, Antidote claims that it was erroneous for CMS to ignore the late data set Antidote submitted when CMS issued the Initial Denial.  Because of this alleged oversight, Antidote claims it lacked the ability to obtain meaningful review.

Not so.  For one, the Initial Denial does not constitute "final agency action," and so its substance is unreviewable under the APA.  45 C.F.R § 155.1090; 5 U.S.C. § 704.  But so far as Antidote tries to spin a substantive challenge to the Initial Denial into a critique of the reconsideration process writ large, that claim fails, too.  CMS reasonably considered only timely-filed data for the Initial Denial decision.

CMS was "crystal clear" that the privilege of submitting one last data set outside the standard window was "an unprecedented last lifeline."  AR at 122.  And CMS made explicit that it would "proceed with clearing the denial letter" while Antidote compiled and submitted the late dataset.  *Id.*  So in excluding the late dataset from consideration, CMS was only following its own standard procedures.  The Court will not interfere with that.  *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) ("[T]he administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.") (cleaned up).  In the same vein, CMS was accurate to conclude that "Antidote Health did not provide sufficient evidence *during the certification process*" to satisfy the network adequacy standards.  AR at 14 (emphasis added).  By the final deadline of the formal application process, Antidote's data still fell short.

The purpose of the "limited data correction window," then, was for Antidote to supply "near perfect" data for the reconsideration stage.  AR at 122.  This was fully consistent with the regulations, which call for an appellant to "include any and all documentation . . . in support of

its request with its request for reconsideration." 45 C.F.R. § 155.1090.  The regulations therefore contemplate that issuers will present more evidence on reconsideration.  At every step, then, CMS followed its own internal processes.  *See Occidental Petroleum Corp. v. S.E.C.*, 873 F.2d 325, 338 (D.C. Cir. 1989) ("[I]f courts continually review agency proceedings to determine whether the agency employed procedures which were, in the court's opinion, perfectly tailored to reach what the court perceives to be the 'best' or 'correct' result, judicial review would be totally unpredictable.") (quoting *Vermont Yankee*, 435 U.S. at 546).  In short: it was "logical and rational" for CMS to move ahead with the Initial Denial based only on the timely submitted data, and then factor in the late data on reconsideration.  *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015).  CMS threw Antidote a bone.  Antidote cannot now bite the hand that fed it.

Antidote tries another tack.  It asserts that it was "categorically deprived of any meaningful opportunity to seek reconsideration" because it was "left in the dark" as to the arguments it needed to make on appeal.  Pl.'s Mot. Summ. J. at 15.  According to Antidote, the reasoning of the Initial Denial was effectively moot since CMS ignored the late dataset.

But Antidote was on notice that it needed to clean up more than just its data.  Indeed, the Initial Denial spends more time on the failure of the best-interests standard than on the network-adequacy requirement.  AR at 15–18.  CMS highlighted the "pattern of grossly inadequate oversight by Antidote Health that led it to submit erroneous provider and rate filing information to CMS . . . over the span of multiple months." *Id.* at 18.  So CMS was "reasonably concerned" that the pattern would continue "into the plan year and affect consumers directly, especially since . . . Antidote Health would rely on contractors to administer parts of its health plans." *Id.* Allowing Antidote to fail "would undermine consumer trust in the coverage offered on the FFEs, jeopardizing the integrity of the FFEs." *Id.*

Antidote knew that it needed to address the management issues flagged by CMS. It even tried to do so—albeit feebly. In Antidote's request for reconsideration, it acknowledged that oversight issues were a key concern in the Initial Denial. *Id.* at 22. And it insisted that it had "taken action to meaningfully improve [its] vendor oversight program," "updated [its] Delegation Oversight Policy," and was "in the process of training all responsible employees on the updated policies." *Id*. It claimed it was "acting expediently to ensure . . . that [it] maintain[ed] close oversight of [its] vendors through agreements, audits and a close review of vendor deliverables." *Id*. More, Antidote claimed that it attached the new Oversight Policy to the reconsideration request. *Id.* But no such document was included. *Id.* at 6.

Thus Antidote's claim that "the opportunity to seek reconsideration under 45 C.F.R § 155.1090 lacks legitimacy and credibility" rings hollow. Pl.'s Mot. Summ. J. at 14. Antidote was not forced to "guess" the grounds for appeal. *Id.* at 15. It knew that, wholly separate from the ongoing efforts to fix its data, it needed to show it had adequate oversight procedures in place. It did not do so. Antidote claims that CMS moved the goal posts. But really, Antidote just failed to score.

Having found the Reconsideration Decision both substantively and procedurally sound, the Court holds that CMS is entitled to summary judgment on the APA claims.

### B.

Now, Antidote's Due Process Claim. Antidote stresses that "CMS failed to provide sufficient procedural protections during the agency adjudication." Pl.'s Mot. Summ. J. at 18. But this argument fails from the outset. For one, it is conceded. CMS contested the Due Process claim in its Cross-Motion for Summary Judgment, but Antidote failed to refute CMS in its opposition brief. Def.'s Reply at 16. So the Court understands Antidote as conceding the

arguments made by CMS. *Accord Machado Amadis v. Dep't of Justice*, 388 F. Supp. 3d 1, 11 (D.D.C. 2019), *aff'd sub. nom, Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364 (D.C. Cir. 2020).

In any event, the argument lacks merit. The threshold question for a due process challenge is whether the plaintiff can state a cognizable property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). In other words, the plaintiff must have "a legitimate claim of entitlement" to the interest asserted. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

The problem is that Antidote does not say what it is entitled to. *See* Pl.'s Mot. Summ. J. at 18–19. One possibility is that Antidote is claiming a property interest in certification. But that cannot be right. The certification process does not guarantee a win. CMS is bound by statute to withhold certification unless the applicant meets stringent requirements. 42 U.S.C. § 18031. And even if the applicant meets those requirements, the question is still assessed on an in-depth, case-by-case basis that calls for significant agency discretion. *See* 42 U.S.C. § 18031(e) (noting CMS "*may certify* a health plan" if the requirements are met) (emphasis added); *id.* § 18031(e)(1)(B) (calling on CMS to determine whether a health plan is "in the interests of qualified individuals"). In short, there is no fixed path to FFE participation. So there is no protected property interest in the certification. *Cf. George Washington Univ. v. District of Columbia*, 318 F.3d 203, 207–09 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003).

The only other possibility is that Antidote is claiming an entitlement to the reconsideration *process*. Superficially, this may fare better: The regulations state that "[FFEs] will permit an issuer that has submitted a complete application to a[n] [FFE] for certification of a health plan as a QHP and is denied certification to request reconsideration of such action." 45 C.F.R. § 155.1090(a)(1). But the claim still fails. After all, Antidote "does not have a

17

constitutionally protected interest in having [an agency] adhere to its procedural requirements." *Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 649 (D.C. Cir. 1987).  To hold otherwise would "equate the process due with the substantive interest" at stake—the certification.  *Id.*  In other words, Antidote cannot claim an entitlement to the safeguards themselves.  It has to claim an interest in whatever the safeguards are protecting.  But Antidote cannot do that.

Considering Antidote's failure to identify a cognizable property interest, CMS is entitled to summary judgment on the Due Process claim.

## IV.

For all these reasons, Antidote's Motion for Summary Judgment will be denied.  And CMS's Cross-Motion for Summary Judgment will be granted.  A separate order will issue today.

Dated: October 11, 2024                                         TREVOR N. McFADDEN, U.S.D.J.